451 A.2d 464

**Lawrence GOODMAN and Rosalyn Goodman, his wife, Appellants,**

**v.**

**PATE CONSTRUCTION, INC., Clarence W. Pate and Sigrid V. Pate, his wife, and Northeastern Bank of Pennsylvania, Appellees.**

Superior Court of Pennsylvania.

Argued Jan. 6, 1982.

Filed June 18, 1982.

Thomas J. Newell, Hawley, for appellants.

Patrick M. Connolly, Scranton, for appellees.

Before SPAETH, CAVANAUGH and MONTEMURO, JJ.

## CAVANAUGH, Judge:

Lawrence Goodman and Rosalyn Goodman, the appellants herein, entered into a construction agreement with Pate Construction, Inc. dated November 28, 1977, for the construction of a new home. The cost of the house was to be $43,404.00. The agreement stated in Paragraph Second: "The owner does hereby promise and agree to and with the said contractor that owner shall and will, in consideration of the covenants and agreements being performed and kept by the contractor, as specified, well and truly pay, or cause to be paid unto the contractor ..." the sum of $43,404.00 in accordance with a pay-out schedule. This paragraph further provided that "Owner and Contractor agree to modify this pay-out schedule if required by any lending institution to conform with that institution's pay-out schedule."[1] In February, 1978, the Northeastern Bank of Pennsylvania, the appellee herein, loaned the appellants $49,000.00 for the purpose of financing the construction of their home.

---

1. The contract between appellants (owner) and Pate Construction, Inc. provided, *inter alia*:

   SECOND: The Owner does hereby promise and agree to and with the said Contractor that Owner shall and will, in consideration of the covenants and agreements being performed and kept by the Contractor, as specified, well and truly pay, or cause to be paid unto the Contractor the sum of *Forty- Three Thousand and Four Hundred and Four Dollars*

   dollars ($*43,404.00*)

   lawful money of the United States of America in the following manner:

   | | | |
   |---|---|---|
   | Deposit | $ 1,000.00 | |
   | 1. | $ 20% | upon completion of the foundation and sub-floor. |
   | 2. | $ 30% | upon completion of the roof and siding. |
   | 3. | $ 30% (*1%*) | when the plumbing, heating and wiring have been roughed in. |
   | 4. | $ In above | upon completion of the rough sheet-rock or rough paneling. |
   | 5. | $ 20% | upon final completion of the dwelling by the Contractor. *and Issue the certificate of occupancy C. Ate As.*|

   Owner and Contractor agree to modify this pay-out schedule if required by any lending institution to conform with that institution's pay-out schedule.

Construction of the home commenced in February, 1978. The Northeastern Bank made payments to Pate Construction, Inc. in March, 1978, July, 1978, and two payments in August, 1978, totalling approximately $33,921.00. This amount represented about eighty per cent payable by the appellants to Pate Construction, Inc. under their contract. At the end of August, 1978, Pate Construction, Inc. abandoned the construction of the appellant's home and allegedly some of the work that it performed prior to leaving the job was not done in a workmanlike manner. In December, 1979, the appellants commenced an action in assumpsit against Pate Construction, Inc., Clarence W. Pate, Sigrid V. Pate and Northeastern Bank of Pennsylvania. The bank filed a motion for summary judgment which was granted by the court below and forms the basis of this appeal. Based on a stipulation of counsel the court below entered judgment in favor of the appellants and against Pate Construction, Inc. in the amount of $42,851.28, the principal amount appellants sought against Pate Construction, Inc. in their complaint in assumpsit. Also, based on counsel's stipulation, judgment was entered in favor of the individual defendants, Clarence W. Pate and Sigrid V. Pate and against the appellants.

The sole issue on appeal is whether summary judgment was properly entered in favor of Northeastern Bank of Pennsylvania and against the appellants. It is axiomatic that summary judgment will be entered only in a clear case. *Hankin v. Mintz,* 276 Pa.Super. 538, 419 A.2d 588 (1980). A summary judgment may be granted where the pleadings, depositions, interrogatories and admissions on file show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. *Bollinger v. Palmerton Area Communities Endeavor, Inc.,* 241 Pa.Super. 341, 361 A.2d 676 (1976); *Community Services of Clearfield, Inc. v. Local 2665, American Federation of State, County and Municipal Employees, AFL–CIO,* 292 Pa.Super. 238, 437 A.2d 23 (1981). Applying these rules, and interpreting the facts most favorably to the appellants there is nothing in the record that establishes a promise by the

bank that it would not release funds to Pate Construction, Inc. unless the work had been performed in a workmanlike manner.[2] The bank was not a party to the contract between the appellants and Pate Construction, Inc. Further, the pay-out schedule entered into between the appellants and Pate Construction, Inc. provided that the appellants and the contractor would modify the pay-out schedule if required by any lending institution to conform with the institution's pay-out schedule. While it might be argued that the appellants had the right to rely on the bank's undertaking to engage in *some* kind of pay-out plan, there is nothing in the evidence to suggest that the bank undertook an obligation to appellant to pay out sums only on a *pro tanto* basis in strict accordance with the exact progress of the construction and precise conformity to the requirements of the building contract to which it was not a party.

The depositions reveal that there were no genuine issues as to any material fact. Lawrence Goodman, one of the appellants, testified as follows with reference to the bank's obligations:

Q. When you closed your mortgage at the bank, who represented you?

A. I believe it was a title company.

Q. Did you have any attorney present?

A. No.

Q. Was there an attorney from the bank present?

A. Don't believe so.

2. The complaint by appellants against Northeastern Bank of Pennsylvania contained the following conclusions:

19. Under the terms of the loan, the funds were to be released by defendant NORTHEASTERN BANK OF PENNSYLVANIA to defendant PATE CONSTRUCTION, INC., in accordance with the phases set forth in paragraph two (2) of the contract between plaintiffs and defendant PATE CONSTRUCTION, INC., which has been marked as Exhibit "A".

20. As consideration for the plaintiffs entering into said loan, plaintiffs were assured by the defendant, NORTHEASTERN BANK OF PENNSYLVANIA that it would inspect the construction site prior to releasing any phase payment to determine that the work specified in the contract was completed and that it was done in a workmanlike manner.

Q. Did anybody at the closing advise you as to the procedures the bank uses with respect to disbursement of the monies that they are holding in escrow for the construction of the house?

A. They advised me that I had paid $125 inspection fee, and I assumed the bank was going to inspect and protect me.

.  .  .  .  .

Q. Who initiated the discussion between you and whatever bank officer it was concerning inspection to be undertaken by the bank or on its behalf?

A. I don't recall anybody.

Q. What I am asking you is, did the bank inform you that they were going to inspect your property or did you ask them to inspect your property?

A. The bank sent me a bill included in their closing $125 for inspection fees, and I assumed that meant they were going to inspect.

Q. What were you told about the inspection that they would undertake specifically, if anything?

A. I don't recall what I was told except that I recall having told them that, "You are going to be my watchdog."

Q. In your complaint, Mr. Goodman, Paragraph 20, you allege that as consideration for entering into the loan that you were assured by Northeastern Bank that they would inspect the construction site prior to releasing any any phase payment to determine whether any work specified in the contract was completed and that it was done in a workmanlike manner.

Two questions. First of all, the contract referred to in that, and correct me if I am wrong, I understand that to mean the contract between you and Mr. Pate, is that correct?

A. I think he would argue and say it was Pate Construction.

Q. O. K. Between you and Pate Construction and/or Mr. Pate individually, but Northeastern Bank is not a party to that contract, is that correct?

A. Legally I don't know.

Q. Did a representative of Northeastern Bank sign the contract?

A. I don't believe so.

Q. What was the basis for your understanding that Northeastern Bank would inspect the property to be sure that work was done in a workmanlike manner as alleged in your complaint?

A. Inspection fee.

Q. You spoke earlier, I believe about a second set of plans.

A. Yes.

Q. Did you ever supply a copy of that second set of the plans to the bank?

A. No.

.    .    .    .    .

Q. I believe you also testified earlier that there came a time when you contacted Northeastern Bank and spoke to Mr. Graham and a, or a Mr. Fichterl concerning problems you were having with Mr. Pate, is that correct?

A. Yes.

Q. Can you give me an approximate time as to when you did that?

A. I would say that started in September or October of '78.

.    .    .    .    .

As I understand your testimony, correct me if I am wrong, you predicate your charges against Northeastern Bank as far as its failure to inspect or properly inspect on the imposition of a $125 fee for inspection, is that correct?

A. The fee is just representative of what I thought was supposed to have been done by the bank.

Q.  Was there anything else told to you by anybody else at the bank, or were there other documents given to you by anybody at the bank?

A.  Not that I can recall.

With respect to the inspection fee Mrs. Goodman testified:

He mentioned that we got mortgage approval at the beginning.  The one thing he didn't mention was we also signed a paper so that the bank could inspect and keep track of construction because we had never built a house before.  We did not live in the area.  We signed that agreement willing to pay them for inspections so that we could be sure that the house was completed properly and so they could release funds once they checked.

.    .    .    .    .

BY MR. CONNOLY:

Q.  I just have a few questions.  You signed a form permitting the bank onto the property.  Was there anything else that you might have been told at the closing by the bank?

A.  No.  I remember Larry saying, "We don't live here, and we are counting on you to watch out for us because we can't keep track of the building, and I have never built a house before.

■  There is no dispute that appellants paid $125.00 to the bank as an inspection fee and that the bank paid Mr. Kirk a fee for making the inspections.  However, acceptance of an inspection fee does not of itself constitute an implied agreement by the bank that the money will not be paid out unless the house has reached the proper stages of completion and the work has been performed in a workmanlike manner.  As noted in *Federal Land Bank of Baltimore v. Fetner,* 269 Pa.Super. 455, 462, 410 A.2d 344, 348 (1980):

Ordinarily, there is no duty on the part of a lender to inspect the mortgaged property to determine that the borrower is obtaining that which he may have been promised by the vendor or that which he believes he is obtaining.  *Unless some further obligation is assumed, the lend-*

*er's inspection of the premises to be mortgaged is made only to ascertain whether the property has sufficient value to secure the loan and is made by the lender for its benefit only.* (Emphasis added).

■ The question of the promise, if any, made to the appellants concerning inspection was fully covered by the appellants in their deposition. It is clear that the bank made no promise either express or implied that it would do anything on behalf of the appellant in exchange for the $125.00 inspection fee that the bank charged. Mr. Goodman testified that he paid the inspection fee "and I *assumed* the bank was going to inspect and protect me." (Emphasis added). The following testimony by Mr. Goodman establishes that no promise was made on the part of the bank on behalf of Mr. Goodman and that Mr. Goodman merely assumed that in exchange for a $125.00 fee that he would be protected:

Q. Who initiated the discussion between you and whatever bank officer it was concerning inspection to be undertaken by the bank or on its behalf?

A. I don't recall anybody.

Q. What I am asking you is, did the bank inform you that they were going to inspect your property or did you ask them to inspect your property?

A. The bank sent me a bill included in their closing $125 for inspection fees, and I assumed that meant they were going to inspect.

Q. What were you told about the inspection that they would undertake specifically, if anything?

A. I don't recall what I was told except that I recall having told them that, "You are going to be my watchdog."

Appellants' cause of action depends on the existence of a contract with the bank to release funds only when work specified in the contract was completed and done in a

workmanlike manner. Basically, a contract is a legally enforceable promise. Williston on Contracts, 3rd Edition, Vol. 1, § 1 gives the classic definition of a contract wherein it is stated: "A contract is a promise, or set of promises, for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." In order to have an enforceable contract, the nature and extent of the obligations must be certain, and the parties themselves must agree upon the necessary and material details of the bargain. *Lombardo v. Gasparini Excavating Co.*, 385 Pa. 388, 123 A.2d 663 (1956). The appellants have established no promise, either express or implied, on the part of the bank to do what they assumed it would do. As stated in *Lombardo v. Gasparini Excavating Co., supra,* at 385 Pa. 393, 123 A.2d 666: "Under such circumstances it is quite apparent that the alleged contract was much too indefinite for plaintiff to reasonably believe he could ever enforce it in an action at law for damages."

Appellants' brief summarizes their position very succinctly where it states: "Further, appellants testified by way of deposition that *they believed* appellee bank would inspect their home to determine the quality and quantity of work prior to an installment payment being released and only make the payment if the work was satisfactory." Looking at the undisputed facts in the light most favorable to the appellants it is clear that there was nothing to justify their belief other than the fact that they paid $125.00 to the bank as an inspection fee. The bank was furnishing the money for appellants' home and the collateral to secure the loan was the house. It was in the bank's best interest to make sure that the loan was properly secured before advancing money to the builder. Accordingly, the bank had an inspector look at the property before releasing funds. In the event that money was paid to the builder, and the value of the house was insufficient to cover the indebtedness, then in the event of a default by the mortgagors the bank would run a substantial risk of not having its indebtedness repaid.

Appellants have taken this situation and, in effect, have assumed that the bank which furnished the funds for the house was also going to become the guarantor of the quality and quantity of the work to be done by their builder. Without any basis, other than paying a $125.00 inspection fee, the appellants believed that they did not have to concern themselves with how well Pate Construction, Inc. was performing the building contract as the bank would be their "watchdog" and guarantee satisfactory performance. The undisputed facts in the record are much too fragile to support the heavy obligation which appellants assumed the bank was going to undertake. The appellant, Mr. Goodman, is a certified public accountant and presumably a person familiar with business and financial matters. It is difficult to understand why he assumed that the bank would undertake such obligations in the absence of any agreement to do so.

Finally, their is no dispute as to the terms of the alleged contract with reference to the inspection. Appellants paid their fee and assumed that certain things would occur. The function of the contract interpretation and construction is a question of law peculiarly within the province of the court. *National Products Co., Inc. v. Atlas Financial Corp.*, 238 Pa.Super. 152, 364 A.2d 730 (1975). The court below, after examining the record found no issue of fact concerning the alleged duty on the part of the bank to inspect the premises during construction to insure that the construction was being performed in a workmanlike manner. The bank was not a party to the contract entered into between appellants and Pate Construction, Inc. Although it appears that Pate Construction, Inc. defaulted on its contract, as judgment was entered against Pate Construction, Inc. in favor of the appellants by stipulation, there is nothing in the record that makes the Northeastern Bank of Pennsylvania responsible for the default.

Order affirmed.