517 A.2d 547

**John T. GARBISH and Diane Garbish**

v.

**MALVERN FEDERAL SAVINGS AND LOAN ASSOCIATION, Appellant.**

Superior Court of Pennsylvania.

Argued Jan. 13, 1986.

Filed Sept. 29, 1986.

Reargument Denied Nov. 25, 1986.

284

286

Robert J. Shenkin, West Chester, for appellant.

Jerome R. Balka, Philadelphia, for appellees.

Before ROWLEY, MONTEMURO and KELLY, JJ.

## OPINION OF THE COURT

ROWLEY, Judge:

This is an appeal from a judgment entered in appellees' favor following denial of appellant's post-trial motions for a new trial or judgment n.o.v. Appellant argues that it is entitled to a judgment n.o.v. because it owed no duty to appellees. Appellant also argues that it is entitled to a new trial because of a plethora of erroneous evidentiary rulings and the conduct of counsel. Appellant's final argument is that the judgment should be stricken because it does not conform to the order of court authorizing the entry of judgment. We affirm the judgment.

On review of a decision denying a motion for judgment n.o.v., an appellate court must consider the evidence in the light most favorable to the verdict winner. *Elder v. Orluck*, 334 Pa.Super. 329, 483 A.2d 474 (1984); *Hargrove v. Frommeyer*, 229 Pa.Super. 298, 323 A.2d 300 (1974). Considering the evidence by this standard, the facts are as follows.

In early 1977, Appellee, John Garbish, was transferred by his employer to work in or near Chester County, Pennsylvania. Thereafter in April, 1977, he and his wife sought to purchase a piece of real estate near his new place of employment and to build a home on it. They entered into an agreement of sale for several acres of land and they contacted Eastern Regional Builders which provided them with preliminary plans for a house and with which they contracted for construction of the house. To finance the construction, which was to cost $55,000, appellees needed to borrow $39,000. Appellant agreed to provide appellees with a mortgage for this amount.

At the settlement held on May 24, 1977, appellees and Edward Donovan, one of the principals of Eastern Regional Builders,[1] were required by appellant to execute a building agreement on a form apparently supplied by appellant. Schedule "B" of the building agreement recited that the consideration for the labor and materials itemized in Schedule "A" was to be $55,000 to be paid "by voucher to materialmen, contractor and subcontractor as work progressed." Schedule "A" of the building agreement was blank. However, at the same time that the building agreement was executed, appellant presented to appellees for the first time a "schedule of operations" which it had required the builder to execute and appellees to initial and date. This schedule was a detailed and itemized breakdown of materials and labor costs used to arrive at the contract price of $55,000, e.g., lumber was to cost $7,000, excavation was to cost $180, and footings and foundation were to cost $350. The total on the schedule of operations equalled the contract price of $55,000. Also at the settlement, appellees

1. Between the date of settlement and mid-July, 1977, Eastern Regional Builders suffered business difficulties and dissolved. Edward Donovan, individually, then contracted with appellees to perform the same construction for the same price. Before construction was commenced in mid to late July, Donovan and appellees executed a new building contract, a copy of which was placed in appellant's file and labelled "replacement contract." Unlike the building agreement prepared on appellant's form and executed at the settlement, the replacement contract, drafted by Donovan, made no references to appellant and included no clauses purporting to limit appellant's liability.

were required to initial a detailed Description of Materials executed by Donovan and to provide appellant with a check for $16,000, the difference between the total contract price for the house and the $39,000 which appellant was loaning appellees, so that appellant would have a building fund equal to the total contract price which it could administer.

In negotiating the mortgage, appellees were informed that for construction contracts appellant utilized a voucher system to administer the building fund. Appellees requested that they be permitted to participate in the payment system and be required to co-sign the vouchers with appellant to ensure their authorization for payment and to ensure notice of when payments were being made and for how much. Appellant, however, told appellees that such a procedure was contrary to the appellant's policy and that appellant was expert in the disbursement of construction fund money.

After construction of the house began, the contractor submitted to the appellant and received payment for approximately fifty vouchers of which appellant allowed appellees to approve only four. Under the voucher system utilized by appellant, the vouchers, submitted by the contractor, indicated what work was performed or materials purchased, where the work was performed and to whom the check was to be made payable. The vouchers also showed the total contract price, the amount paid to date, the amount requested by the vouchers and the balance remaining on the contract price. The invoices of materialmen and subcontractors were attached to only seven of the vouchers. Each of the vouchers indicated that the work had been inspected and approved. But appellant's inspectors, one of whom was on appellant's Board of Directors, at best only inspected the site to see if the work claimed was done. The inspectors never saw the schedule of operations, and were unaware of whether the amount on the voucher was within the amount used to arrive at the total contract price, or whether the labor listed on the voucher was an item even included on the schedule of operations and therefore contemplated by the

parties in reaching the total contract price. Furthermore, before checks were issued by appellant, no one employed by appellant verified the vouchers with the schedule of operations and no one compared the vouchers to the invoices which were attached to them.

The evidence shows that amounts were disbursed under this voucher system for labor or materials in excess of the amounts listed on the schedule of operations which was used to calculate the total contract price. For example, the appellant paid $11,096.28 for lumber which is listed on the schedule of operations as costing $7,000; appellant paid $1,030 for excavation which is listed on the schedule of operations as costing $180; and appellant paid $790 for concrete footers which are listed on the schedule of operations as costing $350. The record also shows that payments were made for labor and materials which were not included at all on the schedule of operations such as aluminum windows ($1,780) and a fiberglass shower ($150). Finally, the record shows that some of the work for which payment was made was done on another job. Attached to voucher # 13 which authorized payment of $688 for grading and backfill was an invoice from the subcontractor showing that at least $112 of the $688 was for work performed at the contractor's own house which was being constructed nearby; voucher # 8 which requested payment of $4,600 for a sewer system ($1,600 over the cost listed on the schedule of operations) had an invoice from a subcontractor attached to it which indicated that $1,620 of the amount vouchered was for an old bill to the contractor; and voucher # 28 which was paid in full ($1,620) had an invoice attached to it which specifically stated that at least $450 of the total bill was for work done at the contractor's own house.

By the time appellees considered the contractor to be in breach of the contract due to failure to complete the house timely and requested that appellant stop making any payments to the contractor whom appellees were discharging, the house was only 40% completed. Appellees learned, however, that approximately 90% of the funds in appellant's

possession had been disbursed. ($50,000 of the $55,000.) Therefore, appellees sued appellant, in both assumpsit and trespass, claiming that money had been paid by appellant for work which was never performed at their house, for materials not used at their house, and for work and materials which were not included on the schedule of operations and which were in excess of the amounts listed on the schedule of operations.

The jury returned a verdict for appellees in the amount of $23,283.67, which sum was reduced by the trial court to $20,928.56 (which included interest in the amount of $5,191.56). The trial court computed this figure by remitting the verdict to allow as damages only those sums which appellant had disbursed in excess of the amount provided on the schedule of operations, for items not included on the schedule of operations, or for labor or materials which the evidence showed were not provided for the construction of appellees' house but for some other project. Appellees praeciped for judgment in the amount of $23,916.72 which was entered. Appellant filed a petition to strike the judgment, but before disposition of the petition, it filed the instant appeal.

## I.

The primary issue raised in this case is one of first impression in this Commonwealth: what is the duty of the mortgagee to the mortgagor with regard to disbursement of a construction fund comprised of both the proceeds of a mortgage and cash belonging to the mortgagor when the mortgagee exercises exclusive control over the fund. Appellant argues that it owed the mortgagor no duty with regard to the disbursement of the funds, that the agreement among the parties included a clause specifically relieving appellant from all liability to either the mortgagor or the contractor, and that even if it did owe appellees a duty, there was no evidence indicating the standard of care by which it was required to exercise that duty. Appellant also

disputes that it had exclusive control of the construction fund.

### A.

Initially, we must address appellant's contention that it did not exercise exclusive control over the disbursement of the funds. The evidence demonstrates that appellant denied appellees' request to have the right to co-sign all vouchers submitted by the contractor. The evidence also shows that of approximately fifty vouchers paid by appellant, all but four were paid without any notice to appellees of the materials or labor covered by the vouchers or the amount being disbursed. The mere fact that appellant contacted appellees with regard to payment of four of the vouchers and agreed to cease all payments after the contractor had allegedly breached the agreement, does not disturb the exclusivity of appellant's control of disbursement of the fund. At all times appellant had absolute authority to decide who would sign the vouchers, and appellant never believed itself to be legally obligated to obtain the mortgagors' signatures on the vouchers. Appellant chose to let appellees sign four of the vouchers. The appellant's power to choose which vouchers it wanted appellees to approve before payment evidences the absolute control appellant had. Appellant was the party who disbursed the money, appellant was the party who decided which vouchers it would allow appellees to co-sign, and appellant was the party who determined when and how much information it would provide appellees about the vouchers. Therefore, appellant exercised exclusive control.

### B.

No court of this Commonwealth has addressed the issue of the duty of a mortgagee who exercises exclusive control of a construction fund toward the mortgagor. When the consideration for a mortgage is a loan by the mortgagee to the mortgagor, the loan funds must actually come into the hands of the mortgagor or his agent absent some other

arrangement between the parties. 59 C.J.S. § 297. Thus where the mortgagee retains possession of the mortgage funds, courts in other jurisdictions have found the mortgagee liable for improper disbursement either on the theory that there was an express contractual agreement governing the distribution of the proceeds or, where there is no express agreement, on the theory that the mortgagee became the agent of the mortgagor.

In *Goodner v. Lawson*, 33 Tenn.App. 676, 232 S.W.2d 587 (1950), the court considered the relationship between a mortgagee and a mortgagor where the mortgagee retained the loan proceeds and assumed the responsibility for disbursing them. The court held that the relationship of the parties remained that of a borrower and a lender and did not become that of a principal and agent because each party had independent and distinct interests. Therefore, in the absence of an express agreement by which the lender undertook certain obligations, there would be no liability. The only responsibility on the lender which arose out of the relationship between the parties was that the mortgagee had to account to the mortgagor for the distribution of the proceeds.

*In Falls Lumber Company v. Heman*, 114 Ohio App. 262, 181 N.E.2d 713 (1961) and *Prudential Insurance Company of America v. Executive Estates*, 174 Ind.App. 674, 369 N.E.2d 1117 (1977), the courts discussed the responsibility of a mortgagee to a mortgagor as stemming from both an express agreement and a principal/agent relationship. In *Falls Lumber,* the mortgagee agreed to loan the mortgagors part of the money to purchase some land and to have a house constructed on it. The construction company required the mortgagors to secure an additional sum to insure payment for the house and the mortgagee required the mortgagors to deposit this additional security with it in escrow. The mortgagee told the mortgagors that they "would take care of things." After the house was completed and all the money had been disbursed by the mortgagee, mechanics liens were filed against the property. The court

concluded that there was an oral agency contract: "the advance of funds by the Bank was a construction mortgage loan, and such Bank assured Mr. and Mrs. Heman that they would take care of all matters respecting the proper disbursement of the funds, so as to protect Mr. and Mrs. Heman from any claims which would cause them to pay more for their home than the amount agreed upon by the parties." *Id.*, at 715. The court compared the duty of the Bank in *Falls Lumber* to that of a trustee who is to hold and disburse funds of the trust estate. It held that the Bank had a duty to use reasonable care to see that materialmen and sub-contractors were paid by the contractor. The failure to do so resulted in the Bank subjecting itself to an action in tort for the loss which was sustained.

In *Prudential,* the court found the mortgagee liable to the mortgagors for mechanics liens because of an express agreement and the principal/agent relationship of the parties. The court stated, "If the mortgagor is denied actual possession of the mortgage proceeds, it would appear the mortgagee has kept them to disburse himself under a special agreement, or has placed himself in a position of trust in the absence of an agreement." *Prudential Insurance Company of America v. Executive Estates,* 369 N.E.2d at 1124. The court found an express agreement that the mortgagee would be the mortgagors' agent based on the fact that when the mortgagors expressed concern about mechanics liens which had been filed, the mortgagee reassured them that "everything would be taken care of" at the closing and the mortgagee provided further assurances that it would get the performance bond release. The court also found that the mere relationship of the parties as mortgagors and mortgagee created a duty:

"a mortgagee-lender who insists on controlling disbursement of the loan proceeds in order to protect its own interests (mortgage lien), deprives the mortgagor of possession of the loan proceeds for which he has bargained, and in doing so must equitably be considered as the

mortgagor's agent saddled with a duty to use reasonable care to protect the principal's interests." *Id.*, at 1128. Two other courts have found a duty on the mortgagee arising solely out of the principal/agent relationship of the parties. In *M.S.M. Corporation v. Knutson Company*, 283 Minn. 527, 167 N.W.2d 66 (1969) the court stated, "When a mortgagee undertakes to disburse funds for a mortgagor under a construction contract, a fiduciary relationship arises." *Id.*, at 68. And in *Bollinger v. Livingston State Bank and Trust Co.*, La.App. 187 So.2d 784, 787 (1966) the court stated:

Unquestionably the bank owed plaintiff a duty in this case. The legal relations existing between plaintiff and the bank were created by the delivery of the collateral mortgage note and building contract to the bank and by the bank's undertaking to advance money and supervise construction as to quality and quantity as the agent of plaintiff. The duty which the bank owed to plaintiff was that of a fiduciary and agent, for this is the nature of the relationship created between them.

■■■ Considering the instant case in light of the analysis adopted by the courts in the aforementioned cases, we conclude that the relationship between the appellant and appellees was more than just that of a lender and borrower. Appellant not only retained the proceeds of the construction loan to distribute, but, as in *Falls Lumber*, also demanded that appellees provide it with the balance of the total contract price. Furthermore, appellant not only refused to allow appellees any control over the distribution or even to provide any notice of how the money was being distributed, but also claimed it was expert in distributing construction funds. Under Pennsylvania law, an agency relationship arises whenever a person authorizes another expressly or by implication to act as his agent. *Falconer v. Mazess*, 403 Pa. 165, 168 A.2d 558 (1961). On the facts of this case, we find that appellant's insistence that appellees rely on its experience in disbursing construction funds by retaining the loan proceeds and demanding appellees' additional $16,000

contribution to the construction fund equitably requires us to hold that the parties' relationship, which was imposed by appellant, was an implied agency. Therefore, appellant owed appellees the duty of an agent in disbursing the construction fund.

The duty which appellant owed appellees in this case and the circumstances for imposing that duty are distinguishable from the facts in the cases relied upon by appellant and the duties sought to be imposed in those cases. The appellant relies on *Henry v. First Federal Savings and Loan Association of Greene County*, 313 Pa.Super. 128, 459 A.2d 772 (1983), *DiAndrea v. Reliance Savings and Loan Association*, 310 Pa.Super. 537, 456 A.2d 1066 (1983), *Goodman v. Pate Construction, Inc.*, 305 Pa.Super. 147, 451 A.2d 464 (1982) and *Federal Land Bank of Baltimore v. Fetner*, 269 Pa.Super. 455, 410 A.2d 344 (1979). In none of these cases did the mortgagee have exclusive control of the construction funds, in none did the mortgagee hold itself out to be an expert, and in none was the duty sought to be imposed the same as the duty in this case.

In *Henry, DiAndrea* and *Goodman*, the mortgagors and the mortgagees (who did not claim to be experts in disbursement of construction funds) jointly participated in disbursement of the construction fund. Also in these three cases, the duty sought to be imposed was the duty to inspect for quality of workmanship because after some of the construction was completed, the owners, in each case, allegedly found defects in the construction. In the case before us, however, appellees did not claim that the quality of work was inferior. Rather they claimed that payments were made for work or materials specifically itemized on the vouchers as not relating to appellee's construction project and for work and materials not contemplated by the construction contract and in excess of the amount anticipated by the parties. Therefore, appellees in this case are not attempting to impose on the mortgagee the duty to inspect for the quality of work performed. Rather, they seek to impose on the mortgagee, who alone knew for what the

funds were being distributed, the duty to ascertain prior to disbursing the contract funds that the labor and materials included on the vouchers were items the obligation for payment of which appellees had contracted and established the construction fund. This duty is also entirely different from the duty to inspect the title which the court refused to impose on the mortgagee in *Fetner*. Because of the multiple differences between the cases relied upon by appellant and the facts in this case, we find the cases cited by appellant not to be controlling or persuasive as to the mortgagee's duty arising out of the agency relationship existing in this case.

 Under Pennsylvania law, the duty of an agent to his principal is one of loyalty in all matters affecting the subject of his agency, and "the agent must act with the utmost good faith in the furtherance and advancement of the interests of his principal." *Sylvester v. Beck*, 406 Pa. 607, 178 A.2d 755 (1962). This duty is the same as that of a fiduciary which has been described as the duty to act for the benefit of another as to matters within the scope of the relation. Restatement of Trusts, 2d, § 2. Fiduciary relations include, among others, principal and agent. *Id.*, comment (b). Because the relationship between the parties in this case was an agency relationship, appellant owed appellees a fiduciary duty and its conduct must be measured against the standard of care owed by a fiduciary.

 The standard of care imposed on the fiduciary depends on whether or not the fiduciary is or claims to be an expert in the area to which his fiduciary duty relates. When the fiduciary either has or procures his appointment by asserting that he has skill beyond that of the ordinary prudent person, he will be judged by the level of skill that he has or that he claims to have, whichever is higher. *In re Estate of Killey* 457 Pa. 474, 326 A.2d 372 (1974); *Estate of Stetson*, 463 Pa. 64, 345 A.2d 679 (1975); *In re Estate of Lychos*, 323 Pa.Super. 74, 470 A.2d 136 (1983).

■ In this case, appellant represented to appellees that it was expert in the disbursement of construction funds, and by virtue of this assertion it obtained exclusive control over not only the mortgaged funds, but also over appellees cash savings which were to be used to pay for the construction. We hold that where the mortgagee obtains exclusive control of the mortgage fund as well as other funds of the mortgagors which funds are to be distributed for payment of labor and material used in the construction of the building for which the mortgage was obtained, and when the exclusive control of the fund is obtained because the mortgagee represents itself to be expert in the distribution of such funds, the mortgagee will be held to the standard of care of an expert.

■ Although the appellant was not judged by the standard of care of an expert, appellant's conduct was found to be wanting even when judged by a lesser standard. The trial court charged the jury that appellee had the duty to "use due care to see that the disbursements [were] carried out in a reasonable and prudent manner. This obligation carries with it the burden of taking reasonable steps to assure that such payments as are made to the contractor are warranted." (T.T. at 760.) Therefore the jury was instructed to apply only the reasonable person standard to appellant's conduct. However, even though the trial court did not instruct the jury to apply the higher standard of an expert, the higher standard encompasses the reasonable person standard which was applied by the jury. Because we find that the evidence was sufficient to support the jury's finding that appellant failed to meet the reasonable person standard, the evidence was necessarily more than sufficient to establish appellant's breach of the higher expert fiduciary's standard of care which is the standard by which appellant's conduct must be judged.

## C.

■ The fiduciary duty imposed by the trial court was that appellant was to disburse funds only according to the

schedule of operations. Although the trial court relied strictly on the schedule of operations as establishing the standard by which appellant was to make disbursements, we do not agree. The schedule of operations was a part of the contract in this case and must be construed as a guideline for the progress payments which should have been made. Where as here appellant repeatedly disbursed funds greatly in excess of the amounts listed in the schedule of operations and for items not included on the schedule, the payments contrary to the schedule of operations are indicative of a breach of appellant's fiduciary duty. Appellant should have become increasingly aware that the payments unrelated to the schedule of operations were going to result in the house not being completed when the full contract price had been paid. However, because some small deviation from the schedule of operations or one which is counterbalanced could have occurred without affecting the completion of the house for the contract price, we are reluctant to determine that the standard of appellant's duty was to disburse funds solely in amounts precisely equal to those on the schedule of operations in the absence of an express agreement to do so. Because the parties did not expressly agree to disburse funds in strict compliance with the schedule of operations but only as work progressed, the schedule of operations is not the appropriate standard of appellant's duty.

▮ To determine the extent of appellant's fiduciary duty in this case, we must determine what the rights and responsibilities of appellees were. Appellees contracted to pay a total of $55,000 for a completed house, and they further agreed to pay out the $55,000 as work progressed. The vague phrase "as work progressed" must be interpreted consistently with the other provisions in the contract, including the schedule of operations and the total contract price. Thus periodic payments for partial completion had to be proportional to the full payment for final completion. Appellant therefore, had the duty to disburse funds as work progressed but only in proportion to the total contract price.

This duty is comparable to that imposed by the court in *Falls Lumber* to protect the mortgagors from having to pay more for their house than the amount agreed upon by the parties.

It is clear that appellant breached this duty. At the time the contractor was discharged, appellant had disbursed approximately 90% of the building fund. Appellees testified that at that time the house was only 40% completed, and the evidence shows that nearly $16,000 had been disbursed by appellant for work which was not performed on appellees' house and in amounts in excess of those included on the schedule of operations. Appellant did not disburse funds as work contractually agreed upon by appellees progressed because if it had, the house would have been close to 90% completed when 90% of the building fund had been disbursed.

■ Because appellant's duty was to make disbursements only as work contractually agreed upon progressed, and to pay a total of only $55,000 for the completed house, the measure of the maximum damages for appellant's breach of its fiduciary duty is the difference between the sum actually disbursed and the value of the house at the time disbursements ceased. The value of the partially completed house, however, must be calculated in terms of the total price contractually agreed upon, taking into consideration any extra work authorized by the mortgagors.

In this case, appellees testified that the house was 40% completed when disbursements ceased. Therefore, the value of the house at that time must be computed by multiplying 40% by the total contract price of $55,000. This sum, $22,000, represents the total amount which the appellant was authorized to disburse. Therefore, the measure of the damages from appellant's breach can be ascertained by subtracting the dollar value of the partially completed house from the total actually disbursed. In this case, because appellant disbursed $50,000 for a partially completed house whose value is only $22,000, the maximum damages sustained is $28,000, a sum which encompasses both

the verdict of the jury and the verdict as remitted by the trial court and accepted by the appellees.

## D.

 Appellant argues that it was contractually relieved from any liability with regard to disbursing the funds because of the clauses in the building agreement executed by Eastern Regional Builders and the mortgagors at the settlement which recited:

 It is expressly covenanted and agreed that Malvern Federal Savings and Loan Asociation may exercise all rights, powers, privileges and discretions conferred upon the owner by the provisions of this agreement or otherwise, without liability to the owner or the contractor for actions so authorized and taken in good faith.

[Schedule "B"] It is distinctly understood and agreed by and between the parties to this contract (said owner and said contractor) ... that the said Association (which is lending money on the faith and credit of this contract) may, in its discretion, when and as the same may be deemed advisable by it, change or alter the method or basis of the payments as hereinabove mentioned and set forth, and that by reason of its so doing, the said Association shall not incur liability of any kind whatsoever to the said owner, contractor and/or surety or sureties; nor shall said owner, contractor and/or sureties be relieved or discharged from any liability, duty or responsibility, owed to Association or any other party in interest.

These exculpatory clauses are unenforceable by appellant in this case because appellant was not a party to the building contract which contains the exculpatory clauses and no consideration was given for the exculpatory clauses, and because the building contract which contains the exculpatory clauses was not the contract under which the parties were proceeding.

The building agreement which contains the exculpatory clauses, although drafted on a form provided by appellant, does not list appellant as a party to the contract and was

not executed by appellant. The building agreement was not the contract by which appellant promised appellees that it would disburse the construction funds, but rather it was a contract in which the builder promised to construct a house, and, in exchange for the builder's promise, appellees promised to pay $55,000. Not only was appellant not a party to the building agreement, but no consideration was given by appellant nor by either party to the contract (under a third party beneficiary theory) for the exculpatory clauses. Yet consideration is an essential ingredient of a contract, and a promise unsupported by consideration is unenforceable. *Stelmack v. Glen Alden Coal Co.*, 339 Pa. 410, 14 A.2d 127 (1940); 17 Am.Jur.2d Contract § 86. Because appellant was not a party to the building agreement and because there was no consideration for the exculpatory clauses, the clauses are unenforceable.

The exculpatory clauses are also unenforceable because they are contained in a contract under which there was never any performance. The building contract containing the exculpatory clauses was made between appellees and Eastern Regional Builders, and it is pursuant to appellees' rights under that particular contract that appellant purportedly obtained the right to exercise all the rights of appellees and to alter the method or basis of payment without incurring any liability. However, Eastern Regional Builders performed no work under the contract, and inasmuch as appellant paid money to Donovan individually and to subcontractors or materialmen for work performed or materials supplied under the replacement contract between Donovan and appellees, which replacement contract was maintained in appellant's file and which was admitted into evidence in this case, any steps taken by appellant with regard to disbursement of the funds for work performed by a builder was done pursuant to appellees obligations under the replacement contract. The building contract between Eastern Regional Builders and appellees was not the contract under which the parties were acting, and therefore, because appellant disbursed the construction funds on behalf of appellees as was their obligation under the replace-

ment contract and not pursuant to the first building contract with the exculpatory clauses, it is clear that the terms of the first building agreement are inapplicable. Therefore, the exculpatory clauses contained in that agreement are not available as a defense.

Even if we were to find that the exculpatory clauses were applicable in this case and if there were consideration for the clauses, we would nevertheless find them to be invalid. To be valid an exculpatory clause must first satisfy three conditions: 1) it must not contravene any policy of the law (i.e., it cannot be a matter of interest to the public or the state); 2) the contract must relate solely to the private affairs of the parties, and 3) each party must be a free bargaining agent (i.e., it cannot be a contract of adhesion). *Employers Liability Assurance Corporation, Ltd. v. Greenville Business Men's Association,* 423 Pa. 288, 224 A.2d 620 (1966). If the clause satisfies these conditions, before it will be given effect it must meet certain standards: 1) the contract must be construed strictly; 2) the contract must deliniate the intention of the parties with the greatest particularity, and must be written in clear, direct, and unmistakeable language; 3) the contract must be construed against the party seeking to be protected by it; and 4) the burden to establish immunity from liability rests on the party asserting the immunity. *Id.,* 423 Pa. at 292, 224 A.2d at 623; *Richard's 5 & 10, Inc. v. Brooks Harvey Realty Investors,* 264 Pa.Super. 384, 399 A.2d 1103 (1979); *Loyal Christian Benefit Assoc. v. Bender,* 342 Pa.Super. 614, 493 A.2d 760 (1985).

The exculpatory clauses in this case were a contract of adhesion and therefore failed to satisfy one of the three requirements for establishing the validity of an exculpatory clause. Appellees were first presented with the contract containing the exculpatory clauses at the settlement in May, and they needed to close on the property as soon as possible so that the house could be built and occupied before school started in the fall. Although there were other lending institutions in the area from whom appellees may have been

able to obtain a mortgage and who may not have attempted to preclude themselves from all liability by requiring the builder and the mortgagees to include in their contract a clause exculpating the mortgagee, there was no evidence that appellees would have been given a mortgage by any other financial institution or that exculpatory clauses would not have been demanded by other financial institutions. Therefore, appellees were in a position of accepting the building agreement with the exculpatory clauses or else not closing the transaction. Because rejecting the transaction entirely was the only option available to appellees other than accepting the contract with the exculpatory clauses, the contract was one of adhesion, and under *Employers Liability Assurance Corp. Ltd. v. Greenville Business Men's Association*, 423 Pa. 288, 224 A.2d 620 (1966) the clauses are invalid.

■ The clauses also failed to satisfy the specificity requirement necessary for giving effect to exculpatory clauses. The exculpatory clauses in this case do not use language which clearly and unmistakably expresses the intention that appellant would be relieved of the liability of an expert construction fund disburser. Paragraph 4 of the building agreement simply purports to give appellant the right to act as the owner of the property but without liability to the owner. This language is general and vague and does not explicitly describe which rights, powers, and privileges of the owner it may exercise nor from what specific duties it is being relieved of liability. Schedule "B" is equally indirect. Although it purports to relieve the appellant from liability for changing the method or basis of payment, it does not specify the type of liability from which it is being relieved, but purports to relieve appellant from liability of "any kind whatsoever." Although such language leaves little doubt that appellant intended to be excluded from liability, neither appellees nor the contractor were provided with notice of the specific nature of the liability and therefore, they could not appreciate the extent of the appellant's exclusion from liability to which, by

signing the contract, they purportedly agreed. This is one of the reasons that exculpatory clauses must be written with the greatest particularity. When they are not particular, as here, they cannot be given effect. *Employers Liability, Id.* Therefore, the exculpatory clauses in this case are ineffective.

## II.

Appellant argues that "the trial was so infested with erroneous evidentiary rulings and prejudicial conduct by counsel for the plaintiffs that a fair trial was wholly lacking and the defendant is entitled to a new trial." Appellant's brief at 33. To support this argument, appellant sets forth a potpourri of complaints about the behavior of counsel, statements of the trial court, and evidentiary rulings. For example, appellant complains about the order of proof, the admission of subcontractor's bills, the implication of appellant's post-loan changes in administrative procedures for its construction loans, the implication of other similar law suits against appellant, various improprieties in the closing remarks of appellees' counsel, the court's ruling on the use of pre-trial depositions, lodging appellant's file with the clerk of courts, admonishment and chastisement of counsel by the court, admission of plaintiffs' exhibits after defendant rested, the evidence sent out with the jury, the manner of reviewing the points for charge, denial of appellant's request for special interrogatories, the court's statement referring to one of its prior experiences, the implication of numerous complaints about its voucher system, authentication of invoices attached to the vouchers, the court's refusal to allow a letter from appellees' former counsel to be read, testimony regarding direct payments to an architect, and testimony concerning appellees' referral to appellant by the real estate agent.

The trial court has addressed the issues related to the chastisement of counsel and the authenticity of the invoices and has properly decided them. (Trial court opinion, March 28, 1985, pp. 15–18.) We have carefully reviewed the record

with regard to each of the other errors alleged and find no prejudicial error. We are mindful that the trial, which was vigorously contested by both parties, lasted an entire week and produced over 800 pages of testimony. Although not every comment, tactic or ruling made by both counsel and the court may have been prudent, not every unwise comment requires a new trial. As stated by the Pennsylvania Supreme Court, "if a slight deviation from technical procedure occurred, the deviation did not take the trial off course to such an extent as to warrant a new trial." *Barb-Lee Mobile Frame Company v. Hoot,* 416 Pa. 222, 226, 206 A.2d 59, 61 (1965). Viewed individually and collectively, the errors alleged in this case do not necessitate a new trial.

## III.

Appellant's final argument is that the judgment should be stricken because it is not in conformity with the order of court which remitted the verdict. This issue was not raised in post-trial motions because the judgment had not yet been entered. Prior to taking the instant appeal, appellant did file with the trial court a motion to strike the judgment. Before the court ruled on the motion, however, the instant appeal was filed. Therefore, the trial court has not yet ruled on the motion. Although we could remand for the trial court's consideration of this issue, we find it unnecessary to do so.

The trial court's order disposing of the post-trial motions remitted the jury's verdict to $15,737.00 with six per cent interest from February 1, 1978 to the date of the verdict, September 19, 1983 for a total verdict of $20,928.56. The computation of the interest was commensurate with that which the court had charged the jury it could include in its verdict.[2] When judgment was entered on the verdict, interest from the date of verdict was added in the amount of $1,988.16 for a total judgment of $22,916.72. The general rule is that a party is entitled to interest on a judgment

---

[2.] Although appellant challenged the propriety of the computation of interest in its post-trial motions, it has not further pursued the issue either in the motion to strike or on appeal.

from the date of verdict. 42 Pa.C.S. § 8101; *Incollingo v. Ewing,* 474 Pa. 527, 379 A.2d 79 (1977); *Sands v. Pennsylvania Insurance Guaranty Association,* 283 Pa.Super. 217, 423 A.2d 1224 (1980). Therefore, even though the judgment appears to be for an amount exceeding that which the trial court authorized by its remittitur, it actually is for the amount authorized by the trial court plus lawfully calculated interest thereon. Therefore, there is no merit to appellant's motion to strike.

Judgment affirmed.

KELLY, J., concurs in the result.