MISTRY PRABHUDAS MANJI ENG. PVT. LTD. Plaintiff,

v.

RAYTHEON ENGINEERS & CONSTRUCTORS, INC. and United Engineers International, Inc. Defendants,

v.

Buffalo Technologies Corporation f/k/a the Blaw–Knox Food and Chemical Company Div. of Blaw–Knox Corporation Third Party Defendant.

No. CIV.A.00–11060–PBS.

United States District Court, D. Massachusetts.

Aug. 6, 2002.

Davids & Schlesinger, L.L.P., Wellesley, MA, Lawrence J. Rose, Scott Rubin,

Sweet & Rose, P.A., Stoughton, MA, for Plaintiff.

Neil W. Salon, Robert J. Kaler, Gadsby & Hannah LLP, Boston, MA, Edward S. Bloomberg, Phillips, Lytle, Hitchcock LLP, Michael J. Berchou, Blaine & Huber, Buffalo, NY, Keith D. Nowak, Goutam Patnaik, Bruce Kanuck, James P. Lynn, Arthur M. Lieberman, Lieberman & Nowak, LLP, New York City, Sharon R. Burger, Nutter, McClennen & Fish, LLP, Boston, MA, for Defendants.

## MEMORANDUM AND ORDER

SARIS, District Judge.

Plaintiff Mistry Prabhudas Manji Engineering Pvt, Ltd. ("MPM") and defendant Raytheon Engineers & Constrictors, Inc. ("REC"), through its subsidiary United Engineers, International ("UEI"), entered into two contracts for licensing and technology transfer agreements for the design and construction of a processing plant for sodium hydroxide, more commonly known as caustic soda. Plaintiff's plans for the plants corroded, they allege, when the plant failed to produce caustic soda at the required purity.

Plaintiff brings claims for breach of contact, misrepresentation, and fraud. Defendants move for partial summary judgment, claiming that plaintiff's fraud and misrepresentation claims are barred by the statute of frauds or, in the alternative, the "gist of the action" or economic loss doctrines. They also argue that the liquidated damages and consequential damages limitation clauses of each contract bar the bulk of plaintiff's claim for damages.

Defendants' Motion for Partial Summary Judgment (Docket No. 38) is *AL-LOWED.*

## BACKGROUND

MPM is a privately held engineering and construction company located in Mumbai, India. REC is an engineering and construction company located in Pennsylvania. REC assumed the contract obligations of UEI, including the two contracts at issue here.

In 1992 and 1993, MPM and UEI entered into two licensing and technology transfer agreements, requiring defendants to supply MPM with "Basic Engineering Packages" for caustic soda processing plants. Caustic soda is used as a cleaner and solvent. The 1992 contract concerned technology for a caustic concentration unit ("CCU"), designed to concentrate liquid caustic soda to a 99.5% concentration. The 1993 contract transferred technology for the creation of a caustic prilling unit ("CPU"), used to create "prills," tiny balls of caustic soda.

For present purposes, the two contracts were quite similar. Each contained a choice of law provision providing that the agreement, "and the legal relationship between the parties," would be governed by Pennsylvania law. Each contained a liquidated damages clause that capped UEI's liability (and REC's by extension) at 10% of the amount MPM paid. Each contained a waiver of "special, indirect, incidental, or consequential damages of any kind" for contract, warranty, and tort claims. Finally, each required a 72–hour performance test to be conducted by MPM within three months of the mechanical completion of the unit. These performance-test clauses provided that if such a performance test could not be conducted within the three-month time limit, through no fault of UEI, the unit would be deemed accepted by MPM.

In 1993, defendants delivered the CCU package to MPM. MPM proceeded to construct the CCU for its client through the remainder of 1993 and beginning of 1994. In April 1994, REC conducted the performance test for the CCU, and MPM's client certified that the performance test was satisfactory.

In 1994, defendants gave the CPU package to MPM. Again, MPM used the package to construct a CPU for its client, completing the plant in early 1995. The CPU reached mechanical completion in April 1995, but did not achieve "start-up" at that time. Several further attempts at achieving start-up took place (in August 1995, December 1995, early January 1996 and November 1998), with corresponding attempts to correct problems. To this date, the CPU plant has not achieved "commercial production." Nor has there been a successful 72–hour performance test.

MPM submitted a formal bill of claims to REC on December 8, 1997. MPM requested $4.65 million, "in connection with the failure of the technology." REC responded by letter on December 31, 1997, rejecting MPM's claims. MPM reasserted its position in a January 9, 1998 letter, which stated that, "MPM ... reserves the right to all its claims at a later date due to complete failure of Raytheon to supply suitable Technology, Software, Hardware, and Technical Services..." MPM's chief executive officer, Nandlal Gothi, agreed at deposition that this "complete failure" stemmed from the technology's inability to produce caustic soda at greater than 99% concentration. (Salon Aff. at Tab 5 (Gothi Depo. Vol. 1 at p. 215)).

MPM filed this action on May 31, 2000, asserting breach of contract (Counts I and II), misrepresentation (Counts III and IV), and fraud (Counts V and VI) by UEI and REC, respectively.

## SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36 (1st Cir.1995) (quoting Fed. R.Civ.P. 56(c)). "To succeed [in a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" *Barbour*, 63 F.3d at 37 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Rogers*, 902 F.2d at 143 (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505) (citations and footnote in *Anderson* omitted). The Court must "view the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor." *Barbour*, 63 F.3d at 36.

## APPLICABLE LAW

The parties agree that Pennsylvania law applies to this action, based on the express choice of law provision of the CCU and CPU contracts.

■ Under Pennsylvania law, "contractual choice of law provisions [only] govern tort claims between contracting parties [if] the fair import of the provision embraces all aspects of the legal relationship. Courts analyze choice of law provisions to 'determine, based on their narrowness or breadth, whether the parties intended to encompass all elements of their association.'" *Jiffy Lube Intn'l, Inc. v. Jiffy Lube of Pennsylvania, Inc.*, 848 F.Supp. 569, 576 (E.D.Pa.1994) (quoting *Composiflex, Inc. v. Advanced Cardiovascular Systems, Inc.*, 795 F.Supp. 151, 157 (W.D.Pa. 1992)). The parties' choice of law provision does sweep this broadly, and this Court will apply Pennsylvania law to all of the claims.

## LEGAL ANALYSIS

### A. Statute of Limitations

■ Defendants argue that plaintiff's misrepresentation and fraud claims (Counts III–VI) are barred by the Pennsylvania statute of limitations. "Any ... action ... which is founded on negligent, intentional, or otherwise tortious conduct or any other action or proceeding sounding in trespass, including deceit or fraud ..." must be brought within two years of the time the cause of action accrues. Generally, "the statute of limitations begins to run at the time 'the right to institute and maintain the suit arises.'" *Beauty Time, Inc. v. Vu Skin Sys., Inc.*, 118 F.3d 140, 143–44 (3d Cir.1997) (quoting *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 503 Pa. 80, 468 A.2d 468, 471 (1983)). Pennsylvania delays the running of the statute of limitations, however, "until the plaintiff knew, or through the exercise of reasonable diligence should have known, of the injury and the cause." *Beauty Time*, 118 F.3d at 144 (quoting *Urland v. Merrell–Dow Pharm.*, 822 F.2d 1268, 1271 (3d Cir. 1987)).

Plaintiff's misrepresentation counts describe its reliance on representations "regarding the validity, effectiveness, and performance of the technology, processes,

Know How, services and equipment" provided by REC. (Complaint ¶¶ 54, 51). Its fraud counts detail how UEI and REC "represented, guaranteed and warranted to MPM that its technology, processes, Know How, services and equipment would result in the construction, testing, start-up and commission of a caustic prilling unit that would produce caustic prills that are 99.5% pure." (*Id.* ¶¶ 57, 65).

To avoid the statute of limitations, plaintiff claims that it did not discover the fraud and misrepresentations until at least 1999. Relying on a series of allegations—most of which are not in the First Amended Complaint—it protests that REC had falsely represented that it had sold this technology all over India (instead of in just one location) and that it had a technology licensing agreement for the CCU maker prior to entering the MPM contract (whereas in reality it did not have a licensing agreement until afterwards). "Most importantly," in plaintiff's words, plaintiff also discovered that this technology had never produced 99.5% concentrated caustic soda prior to plaintiff entering into the CCU contract. Finally, it claims that REC misrepresented that it had experience selling and fabricating prilling units. Pressing a fraudulent inducement claim, MPM asserts that the statute of limitations should not start to run until it discovered defendants' falsehoods in 1999.

Defendants counter this assertion with plaintiff's December 8, 1997 "Bill of Claims" in the amount of $4.65 million, submitted to Raytheon for expenses and material related to changes to the plant design and for loss of profits from the nonworking plant. (Salon Aff. at Tab 7). Raytheon rejected these claims by letter sent December 31, 1997. (*Id.* at Tab 8).

MPM responded on January 9, 1998, stating that it "reserve[d] the right to all its claims at a later date due to complete failure of Raytheon to supply suitable Technology, Software, Hardware and Technical Services of Caustic Prilling." (*Id.* at Tab 9). MPM's 30(b)(6) representative admitted that the claims referenced in the January 1998 letter were the claims it MPM asserted in its complaint.

■ MPM's arguments fail for two reasons. First, with the exception of the alleged misrepresentation of the 99.5% concentration, its other allegations must fail because they are not contained in the First Amended Complaint. Second, it is undisputed that MPM knew of its injury and its cause prior to 1998. Though it may have more fully discovered the scope of defendants' misrepresentations in 1999, MPM's belief in defendants' representations regarding the technology's effectiveness in accomplishing 99.5% concentration had clearly dissolved by the beginning of January 1998—almost four years after the CCU had been built and more than two years before this action was filed.

Accordingly, plaintiff's Counts III–VI are ***DISMISSED.***

## B. Damages Limitation Clauses

Defendants also ask this Court to rule that plaintiff's recovery is capped by the damages limitation clauses contained in the parties' contracts. Each of the contracts contained both a liquidated damages clause and a waiver of consequential damages [1] for any contract, warranty, and tort claims brought against the defendant. Plaintiff makes four arguments why the two damages limitation clauses should not be enforced against it: (1) the liquidated

---

**1.** *Article XV Waiver of Consequential Damages*
 In no event shall Seller [UEI] be liable to MPM whether in contract, warranty, tort (including negligence or strict liability) or

otherwise for any special, indirect, incidental or consequential damages of any kind or nature whatsoever.

damages clause does not apply to MPM's claims; (2) the clauses are unconscionable; (3) the clauses were based on material misrepresentations by REC; and (4) the clauses are the product of mutual mistake.

### 1. Applicability of Liquidated Damages Clause

The liquidated damages clause in the CPU contract states:

*Article VIII Liquidation Damages*

In the event that the Caustic Prill Unit fails to produce Caustic Soda beads during the performance test even though all the conditions described in Article VII hereof have been satisfied and despite UEI efforts to correct said failure, for each 5% or part thereof shortfall below the level warranted in Article VII, hereof, UEI will pay to MPM an amount equal to 5% of the lump sum fee received by UEI for the failed Caustic Prill Unit. However, UEI's maximum limit of liability under this Agreement as to any failed Caustic Prill Unit shall be 10% of the Lump sum fee received by UEI for the failed Caustic Prill Unit. These payments are the exclusive remedies provided to MPM under this Agreement. Except as provided in this Article VIII, Contractor shall have no other liability whether in contract, warranty, tort, or otherwise.

REC asks this Court to hold, as a matter of law, that this clause caps MPM's damages at ten percent of the price paid by MPM to REC. To do so, this Court must first determine the meaning of ten percent provision in the liquidated damages clause.

MPM argues that the liquidated damages clause specifically limits its application to "the event that the Caustic Prill Unit fails to produce Caustic Soda beads during the performance test . . . ." In other words, damages are capped at ten percent only when the CPU has failed the required performance test. If the referenced performance test never took place—and MPM has produced uncontroverted evidence that it did not—MPM claims that the ten percent cap does not apply and it is entitled to sue for damages in amounts greater than ten percent of the lump sum fee. REC, of course, takes the contrary view, contending that the ten percent cap applies regardless of whether an actual performance test has taken place.

In determining the meaning of the ten percent cap, MPM argues that Pennsylvania law requires this Court to employ the four-part test set forth in *Garbish v. Malvern Fed. Sav. & Loan Assoc.*, 358 Pa.Super. 282, 517 A.2d 547, 557 (1986). This test requires that: (1) the contract be construed strictly; (2) the clause specify the intentions of the parties with "greatest particularity" and be written in "clear, direct and unmistakable language" (3) the contract be construed against the party seeking to be protected; and, (4) the burden of establishing immunity from liability lay on the party asserting immunity. *Id.* The applicability of this analysis is not so clear, however. *Garbish* concerned an exculpatory clause, not a damages limitation clause. *Id.*

 The Third Circuit, analyzing a clause such as the one in this case, found error in applying such a stringent standard. *Valhal Corp. v. Sullivan Assocs., Inc.*, 44 F.3d 195, 201 (3d Cir.1995). "Pennsylvania appellate courts recognize that there are differences between a contract which insulates a party from liability and one which merely places a limit upon that liability." *Id.*, 44 F.3d at 201 (citing *DeFrancesco v. Western Pa. Water Co.*, 329 Pa.Super. 508, 478 A.2d 1295, 1306 (1984)). "Presumably because of that difference, [the Third Circuit found] no Pennsylvania cases in which a limitation of liability clause has been disfavored or been

tested by the same stringent standards developed for exculpatory, hold harmless, and indemnity clauses." *Id.* This Court thus declines to apply the *Garbish* test to the damages limitation clause.

■ In interpreting a contract, "the intention of the parties is a paramount consideration ...." *Thomas Rigging & Constr. Co., Inc. v. Contraves, Inc.*, 798 A.2d 753, 755 (2002)(quoting *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 389 (Pa.1986)). "The intent of the parties is to be ascertained from the document itself when the terms are clear and unambiguous." *Id.* (quoting *Hutchison*, 519 A.2d at 389). This Court accordingly looks to the language the parties used.

■ MPM's interpretation has some support in the wording of the clause. The first sentence of the clause discusses damages "[i]n the event that the Caustic Prill Unit fails to produce ... during the performance test." The second sentence then mentions the ten percent remedy "as to any failed Caustic Prill Unit ...," perhaps suggesting that a unit has "failed" only after an unsuccessful performance test. The second sentence also begins with "However," suggesting that the ten percent remedy of the second sentence is related to the five percent incremental remedy of the first sentence.

REC has the more credible interpretation, however. The clause makes clear that the ten percent cap applies to any claim under the CPU Agreement, stating that the cap is the "maximum limit of liability *under this Agreement*," (emphasis added). The clause then states, "These *payments* are the exclusive remedy ... under this Agreement," making distinct the five percent failed-performance-test payment and the ten percent cap payment. MPM's interpretation imposes a ten percent cap if the technology fails the performance test, but no cap whatsoever if no performance test is ever performed be-

cause the plant is likely to fail—a situation unlikely to be intended by the parties. When combined with the extremely strong liability-limiting language of the entire clause, these phrases make clear that the intention of the parties was to limit MPM's recovery under any circumstance to ten percent of the fee it paid to UEI.

**2. Unconscionability**

■ MPM next claims the liquidated damages clauses and consequential damages limitation clauses are unconscionable and thus unenforceable. It argues that it has expended millions of dollars to build a prilling plant after signing an agreement that REC prepared, without MPM making any changes to the agreement or obtaining legal advice. MPM further states that the deal was "the opportunity of a lifetime" and that they were misled about the progress of the technology.

The parties agree that liquidated damages provisions and consequential damages limitations should be enforced unless they are unconscionable. *See K & C, Inc. v. Westinghouse Elec. Corp.*, 437 Pa. 303, 263 A.2d 390, 393 (1970)(under UCC, "consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable"); *Moscatiello · v. Pittsburgh Contractors Equipment Co.*, 407 Pa.Super. 363, 595 A.2d 1190, 1194–95 (1991) (same); *cf. Stanley A. Klopp, Inc. v. John Deere Co.*, 510 F.Supp. 807, 809 (E.D.Pa.1981) (applying reasoning of UCC cases, even if UCC does not apply, because UCC represents "a policy statement by the State Legislature concerning good faith"); *Restatement (Second) of Contracts* § 208 (1981) (stating that courts may refuse to enforce unconscionable terms).

■ This Court holds that the consequential damages limitation and liquidated damages clauses are not unconscionable. The test for unconscionability is "an ab-

sence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Moscatiello*, 595 A.2d at 1195; *see Klopp*, 510 F.Supp. at 810. Both prongs must be present to find a term unconscionable. "The principle underlying the concept of unconscionability is one of the prevention of oppression and unfair surprise and not of disturbance of allocation of risks because of superior bargaining power." *Id.* (quoting 13 Pa. Cons.Stat. § 2302, com. 1); *K & C, Inc.*, 263 A.2d at 393 (business owner's knowledge of allocation of risks under contract defeated claim of unconscionability); *Vasilis v. Bell of Pennsylvania*, 409 Pa.Super. 396, 598 A.2d 52, 54 (1991) (where parties free to negotiate terms of contract "outside the realm of necessary services," no lack of meaningful choice).

■ "In commercial settings, a limitation of damages clause will rarely be found unconscionable." *Borden, Inc. v. Advent Ink Co.*, 701 A.2d 255, 264 (1997); *see Vasilis*, 598 A.2d at 54 ("[W]here, as here, a contract provision affects commercial entities with meaningful choices at their disposal, the clause in question will rarely be deemed unconscionable."). Under Pennsylvania law, a limitation of liability clause in a commercial contract is enforceable "as long as the limitation established is reasonable and not so drastic as to remove the incentive to perform with due care." *Valhal Corp. v. Sullivan Assocs., Inc.*, 44 F.3d 195, 204 (3d Cir.1995). "Mere unequal bargaining power between contracting parties does not render their contracts unconscionable." *Klopp*, 510 F.Supp. at 811. "The burden of proof lies with the party who alleges unconscionability." *Borden*, 701 A.2d at 264.

MPM's claims that it is a small unsophisticated Indian company that trusted an American behemoth when its president flew to Philadelphia to sign the deal. Namely, it made no changes to the contract, failed to seek counsel to assist with its negotiation, and jumped at the opportunity to enter these contracts and invest millions of dollars. Although MPM does raise a sympathetic picture, this scenario does not suggest any lack of meaningful choice. The undisputed facts demonstrate that MPM precipitously entered these contracts without procuring adequate legal representation. There is nothing in the record to suggest unfair surprise in the allocation of risks if the technology failed or lack of a meaningful choice. The clauses were not hidden boilerplate. The one point which gives this Court pause is whether a ten percent cap creates an adequate incentive to perform. However, there is no indication that the profit margin was any higher than ten percent. Therefore, MPM has not demonstrated unconscionability.

### 3. Material Misrepresentation

Plaintiff next claims that the damages limitation provisions in the contract were induced by material misrepresentations and therefore seeks to void the clauses. MPM argues that since a contract may be voidable if assent to the contract was induced by justifiable reliance on a fraudulent or material misrepresentation by the other party, *see Restatement (Second) of Contracts* § 164 (1981),[2] it can avoid the damages limitation clauses if they were procured by fraud.

■ As a threshold issue, defendants argue that the time bar for fraud actions

2. *Restatement (Second) of Contracts* § 164 provides, in pertinent part:
 (1) If a party's manifestation of assent is induced by either a fraudulent or a material

misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient.

precludes plaintiff from asserting this fraud-in-the-inducement "defense." Under Pennsylvania law, plaintiff's claim that the limitation in damages clauses should be voided because they were induced by fraud would be barred by the two-year limitation on fraud actions. As one district court reasoned:

Plaintiffs protest the imposition of any limitations periods, reasoning that they are in an essentially defensive posture and are emphatically not seeking damages. However, statutes of limitation reflect the legislature's considered judgment as to the proper time-frame in which to commence a cause of action. *Resolution Trust Corp. v. Farmer*, 865 F.Supp. 1143, 1152 (E.D.Pa.1994) (Rendell, J.). That judgment cannot be evaded by opportunistic pleading: the substance of the claim matters, not the form of action. To hold otherwise would permit a party seeking to vitiate a contract for fraud (to) circumvent the applicable statute of limitations by characterizing his claim as one for a declaratory judgment that the contract is unenforceable at the time he seeks to avoid the application of its terms, [and] the statute of limitations would soon have little meaning. *Swecker v. Rau*, No. 88–8653, 1990 WL 33944 at *5 (E.D. Pa. March 22, 1990) (Waldman, J.); *Gilbert*, 745 F.Supp. at 47 ("The statute of limitations may not be sidestepped simply by labelling an action one for declaratory or injunctive relief, rather than one for damages.") Accordingly, this Court will impose the statute of limitations applicable to the "substance" of plaintiffs claim for declaratory relief. *See Town of Orangetown*, 718 F.2d at 42.

Count III, grounded on common law fraudulent inducement, seeks to have the investor notes declared void. In Count III, plaintiffs essentially assert a defense of fraudulent inducement. Of course, such a defense is properly raised only by defendants. Plaintiffs' apparent purpose for asserting such a "defense" here (rather than a claim for damages) is to evade the limitations period applicable to claims for fraud—two years—which applies to any "action to recover damages . . . including deceit or fraud." 42 Pa. Stat. Cons.§ 5524(7). Because an action for damages would be time-barred, plaintiffs' corollary declaratory judgment action is also untimely. Count III must be dismissed. *See e.g., Swecker*, 1990 WL 33944 at *5.

*Algrant v. Evergreen Valley Nurseries Ltd. P'ship*, 941 F.Supp. 495, 498–99 (E.D.Pa.1996), *aff'd* 126 F.3d 178 (3d Cir. 1997). To the extent that REC seeks to assert the damages limitations clauses as a defense to a breach of contract action, and MPM seeks to void them because they were induced by fraud, MPM's argument is time barred.

Even if MPM's argument were timely, MPM misapprehends the scope of Section 164 when it asks this Court to declare that *certain terms* may be voidable as a result of misrepresentations. The proper remedy for misrepresentation is avoidance of the contract. *See Restatement (Second) of Contracts* § 164 (1981). The voiding of certain contract terms by this Court would amount to reformation of the parties' contract. A court may only grant reformation of the terms of a contract on misrepresentation grounds if the misrepresentation went to the writing itself, and not to the misrepresentation of some other fact. *See id.* § 166, com. b ("If the misrepresentation related to some other fact [other than the contents or effect of a writing], the contract may be voidable under § 164, but reformation is not appropriate."). As MPM seeks to avoid only the damage limitation clauses and to enforce the remainder of the contract, its claim of misrepresentation does not aid it.

### 4. Mutual Mistake

 Finally, MPM suggests that the damages limitation clauses are the result of mutual mistake. MPM misunderstands this doctrine, however, claiming that REC made misrepresentations regarding the CCU's performance. Mutual mistake requires that *both* parties hold a belief not in accordance with the facts, at the time the contract is made, as to a basic assumption on which the contract was made. *See Restatement (Second) of Contracts* §§ 152, 153 (1981). MPM makes no allegation that either REC or UEI was mistaken as to the performance of the CCU.

### CONCLUSION AND ORDER

REC's Motion for Partial Summary Judgment (Docket No. 38) is *ALLOWED*.