NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 11-4132

_____

HEALTH AND BODY STORE, LLC; HOTHEADZ INTERNATIONAL, INC.,
Appellants

v.

JUSTBRAND LIMITED; JUSTIN SILVERMAN; BRANDON SINGER,

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 11-cv-6638)
District Judge:  Honorable Mitchell S. Goldberg

_____

Argued: March 27, 2012

Before:   FUENTES, SMITH, and JORDAN, *Circuit Judges*.

(Filed: May 11, 2012)

_____

James J. Ferrelli, Esq.
Duane Morris
240 Princeton Avenue - #150
Hamilton, NJ  08619

Gregory A. Lomax, Esq.
Duane Morris
1940 Route 70 East - #200
Cherry Hill, NJ   08003

Robert M. Palumbos, Esq.   [ARGUED]
Duane Morris
30 South 17th Street
United Plaza
Philadelphia, PA   19103
        *Counsel for Appellant*

Michael D. LiPuma, Esq.   [ARGUED]
325 Chestnut Street - #1109
Philadelphia, PA   19106
        *Counsel or Appellees*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Hotheadz International, Inc. ("Hotheadz")[1] and Health and Body Store, LLC

("HBS") (collectively, "Appellants") appeal an order of the United States District Court

for the Eastern District of Pennsylvania denying their motion for a preliminary

injunction.  The motion sought to preclude Appellees Justin Silverman and Brandon

Singer from independently operating two websites (the "Websites") that the parties had

used together to conduct an Internet business.  For the reasons that follow, we will vacate

the District Court's order and remand the matter for proceedings consistent with this

opinion.

_____

[1] Hotheadz's predecessors are Hotheadz of America, Inc. ("Hotheadz Inc.") and
Hotheadz of America, LLC ("Hotheadz America").  Hotheadz Inc. was formed by Jay
Oxenhorn and Bruce Singer, the father of Appellee Brandon Singer.  In 2006, a new
ownership team acquired Hotheadz Inc. and formed Hotheadz America.  Thereafter,
Hotheadz America formed Hotheadz, which assumed ownership of Hotheadz America's
business assets and took control of its business operations.  For ease of reference, we
refer to Hotheadz Inc., Hotheadz America, and Hotheadz collectively as "Hotheadz."

## I.    Background

Hotheadz is in the business of manufacturing and selling products, including hats and other apparel, designed for use in cold weather.  Its distribution channels include flea markets, kiosk retailers, television shopping channel retailers, and hardware stores.  In January 2005, Hotheadz hired Silverman and Singer as sales trainees.  Eventually they became involved in marketing to Hotheadz's kiosk customers.

### A.    *The Websites*

In 2007, while employed by Hotheadz, and with Hotheadz's permission, Silverman and Singer began to independently operate an Internet business selling winter apparel and health products.  A majority of the items Silverman and Singer sold were ones they had purchased from Hotheadz.  They operated the Internet business through the Websites, which were established when Silverman registered the domain names www.healthandbodystore.com and www.thewarmingstore.com (collectively, the "Domain Names") in January and September 2007, respectively.  After the Domain Names were registered, Silverman and Singer put substantial effort into developing the Websites.  They created all of the content on the Websites and paid all advertising costs, which included Internet advertising services.  Eventually, as a result of their efforts, the Websites earned approximately $55,000.00 to 60,000.00 in gross revenue in 2007, $150,000.00 in 2008, and $170,000.00[2] in 2009.[3]

---

[2] Although Silverman testified that the Websites generated approximately $180,000.00 in 2009, his accounting records state that they earned $170,000.00 in 2009.

B.     *The Parties Discuss a Joint Venture*

In late 2008, Hotheadz's Chief Executive Officer, Jeff Zelenko became concerned that Silverman and Singer were devoting too much of their time at work to improving their Internet business. When he approached them to discuss the issue, Zelenko informed them that "they [had] a choice" to either "contribute the ... [Websites] into … [Hotheadz's] business" and they could "work out some sort of a deal" with Hotheadz, or, they could "leave [Hotheadz]" and continue to run their business independently. (App. at 549.) Zelenko also claimed that he offered Silverman and Singer the opportunity to create a joint venture with Hotheadz. According to Zelenko, Hotheadz proposed: (1) that it would own a 75% interest in the joint venture and that Silverman and Singer would collectively own a 25% interest; (2) that it would provide "complete financial support for … the growth of the [new] business"; and (3) that it would "offer its infrastructure to manage the [new] business day in and day out." (*Id.*)

When Zelenko explained his proposal to Silverman and Singer, he did not expressly ask them to transfer ownership of the Websites to Hotheadz, and there is no written documentation containing such an agreement.[4] Nevertheless, although Silverman and Singer did not explicitly agree to the terms Zelenko proposed for a joint venture,

---

[3] During this period, Hotheadz also owned a website called www.hotheadz.net, but, according to Hotheadz itself, the website was "undeveloped," and "did a very minimal amount of volume." (App. at 546.)

[4] Silverman testified that he specifically refused to transfer ownership of the Domain Names unless the parties reached "a full agreement that outlined how this new proposed business would have run," and made clear that "[o]nce [the parties] came to an agreement, that [the Websites were] going to be [his] contribution to the business." (App. at 855.)

4

they did begin to operate the Websites with Hotheadz in the latter part of 2009.

Before September 11, 2009, and sometime after the first discussion of a possible business arrangement, Zelenko sent Silverman and Singer two versions of a "Letter of intent to form [a] Partnership for Internet Division Between [Hotheadz] and Brandon Singer and Justin Silverman" (collectively, the "Letters of Intent" or the "Letters"). (App. at 198, 200.) The Letters of Intent acknowledged that the Websites were "currently owned by Brandon Singer and Justin Silverman," and the Letters included a provision stating that the Websites "would be transferred to [Hotheadz] as of [August/September] 2009" for "no financial consideration." (App. at 198, 200.) Silverman testified that he refused to sign the Letters of Intent because they were "very incomplete" and "didn't have a lot of what [he] felt should be in a contract," including provisions governing revenue sharing (App. at 856), and Singer testified that he refused to sign for the reasons that Silverman explained.

From August 2009 until January 2010, Silverman and Singer continued to operate the Websites to support Hotheadz's business. During that period, Hotheadz purchased the inventory sold on the Websites and paid a large portion of the out-of-pocket expenses Silverman and Singer incurred in operating the Websites. Between September and December of 2009, the Websites generated approximately $75,000.00 in gross revenue.

C.    *The Formation and Operation of HBS*

On January 14, 2010, Hotheadz formed HBS as a limited liability company. The new entity had no employees, and every individual who performed services for it, including Silverman and Singer, was employed by Hotheadz. Although the record does

5

not contain a certificate of ownership interest, subsequent documents filed by the parties, as well as Silverman's testimony during the preliminary injunction hearing, indicate that the only members of HBS were Hotheadz[5] and Justbrand Ltd. ("Justbrand"),[6] a Pennsylvania LLC owned and operated by Silverman and Singer.

Between January 2010 and October 2011, Silverman and Singer continued to operate the Websites with Hotheadz's support. According to Charles Donato, Hotheadz's Chief Financial Officer, Hotheadz provided HBS the following logistical and administrative support during that period:

> (a) [Hotheadz] paid Silverman and Singer their salaries. …;
> (b) [Hotheadz] sold HBS the majority of the goods sold on the Websites at [Hotheadz's] cost. …;

---

[5] The Schedule K-1's generated from HBS's Internal Revenue Service Form 1065 for the year 2010 state that Hotheadz owned a 75% interest in HBS, and Justbrand owned a 25% interest in HBS. HBS's Pennsylvania Enterprise Registration Form states that Hotheadz owned a 50% interest in HBS and that Silverman and Singer each owned a 25% interest in the company. Thus, although the precise ownership interest of each party is unclear, the documentation described above demonstrates, at a minimum, that either Justbrand or Silverman and Singer were the only members of HBS besides Hotheadz.

[6] Silverman testified that he and Singer formed Justbrand in order to hold their ownership interest in HBS:

> Q: Okay. Now you are also aware that [Justbrand] was formed [sometime] in – was formed sometime in March of 2010?
> [Silverman]: Yes.
> Q: And you and Mr. Singer caused that to be formed, is that right?
> [Silverman]: Yes.
> Q: And you agreed to form that company to take your equity in [HBS], is that right?
> A: Yes.

(App. at 816.)

6

(c) [Hotheadz] … provided … all of HBS's warehousing, shipping, accounting, informational technology, customer services, and all of its management services and controls …;
(d) [Hotheadz] … routinely infused capital into HBS to cover any budgetary shortfalls;
(e) [Hotheadz] … carr[ied] large receivables from HBS for inventory sales; and
(f) … . [Hotheadz bore] [a]ll costs of operating the websites … .

(App. at 55.)  However, that support came at significant cost – according to Silverman, Hotheadz informed him that HBS would be charged $240,000.00 in "management fee[s]" in 2010, and that Hotheadz would increase the management fee to $360,000.00 in 2011. (App. 864.)

During 2010 and 2011, sales generated by the Websites increased substantially. Between January 2009 and September 11, 2009, the Websites had generated approximately $170,000.00 in revenue.  In 2010, revenue from the Websites grew to approximately $358,000.00.  Hotheadz projected that revenue from the Websites would grow to $1,100,000.00 in 2011.  All of the revenue that HBS generated through the Websites was deposited into a bank account that HBS opened with Wachovia Bank.

D.      *The Proposed Operating Agreement*

In July 2011, Hotheadz's management team prepared and delivered to Silverman and Singer a draft operating agreement (the "Operating Agreement").  Under the terms of the Operating Agreement, Hotheadz was entitled to take a management fee of at least $20,000.00 per month from the sales generated by the Websites.  The Operating Agreement also contained a provision requiring Silverman and Singer to transfer the Domain Names and the Websites to HBS:

7

> Title to property. All real, intellectual, and personal property owned by the Company [i.e., HBS] shall be owned by the Company as an entity and, insofar as permitted by applicable law, no Member shall have any ownership interest in such property in its individual name or right, and each Member's interest in the Company shall be personal property for all purposes. Moreover, the internet domain names, web site addresses, and Pay Pal accounts … as well as all future domain names, web sites and any other type of accounts used by the Company, are hereby absolutely transferred and conveyed to Company without further consideration.

(App. at 202.) Silverman and Singer did not sign the Operating Agreement.

E. *Silverman and Singer Terminate their Relationship with Hotheadz*

Sometime around August 2011, Silverman and Singer came up with a plan to break off their operating relationship with Hotheadz and HBS. They began to quietly acquire inventory on their personal credit and ship it directly to Silverman's home in Philadelphia, Pennsylvania. Silverman testified that he began stockpiling the inventory so that he and Singer could continue operating the Websites after they terminated their employment with Hotheadz. Silverman and Singer also placed orders for Hotheadz's products through a company called Novell Brands, LLC ("Novell") at wholesale prices, so that they could repurchase the same items from Novell after terminating their operating relationship with Hotheadz. At the time, Silverman and Singer did not tell Hotheadz and HBS of their preparation for terminating their employment with Hotheadz and their relationship with HBS.

On October 11, 2011, Silverman and Singer resigned from Hotheadz and changed the passwords associated with the Websites and the PayPal account that HBS used to collect payments from customers purchasing Hotheadz's products on the Websites. By

8

changing those passwords, they cut Hotheadz off from any control over the Websites and they seized the revenue generated through the Websites. Thereafter, Silverman and Singer operated the Websites exclusively for their own benefit, as they had before the formation of HBS. According to Hotheadz, the appearance of the Websites was identical both before and after October 11, 2011.

F.    *Procedural History*

Hotheadz and HBS commenced this action on October 24, 2011 by simultaneously filing a complaint and a motion for a preliminary injunction. The complaint alleged several claims under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, including trademark infringement, unfair competition, and false designation of origin. It also asserted a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and various common law claims, including misappropriation of trade secrets and confidential information, unfair competition, breach of fiduciary duty, tortious interference with contract, and conversion. The following day, the District Court entered an order requiring Justbrand, Silverman, and Singer to refrain from using, "any trademark owned by Plaintiffs on the websites 'The Warming Store' (www.thewarmingstore.com) and 'Health and Body Store' (www.healthandbodystore.com)." (App. at 995.)

On November 3 and 4, 2011, the District Court held a hearing on the motion for a preliminary injunction. After considering the parties' arguments and taking testimony from witnesses, the Court issued an oral opinion denying the motion. The Court made clear that the focus of its analysis was on the question of whether "there [was] a valid partnership as it relates specifically to the web sites[.]" (App. at 7.) It found that the

9

parties never formed a partnership because there was "no meeting of the minds as to the essential terms of any partnership," including "percentage of ownership," "the duties of … partners," "dissolution of the partnership," and "profit distribution." (App. at 10-11.) In addition, the Court found that there was no evidence that the Operating Agreement, which contained a provision governing ownership of the Websites, "was ever signed and consummated." (App. at 12.) Based on its determination that the parties did not form a partnership, the District Court rejected Appellants' breach of fiduciary duty claim, saying that "there has not been sufficient proof … of a showing of an agreement which would give rise to [a fiduciary] duty so the claim of breach of fiduciary duty … fails." (App. at 14.)

The District Court also held that Hotheadz and HBS were unlikely to succeed on the merits of their Lanham Act claims. It found that their trademark infringement claim was moot because Singer, Silverman, and their vehicle, Justbrand, agreed to remove all of Hotheadz's trademarks from the Websites. As to the unfair competition and false designation of origin claims, the Court rejected the contention that Singer, Silverman, and Justbrand were "representing that the goods sold on the web sites [were] coming from [HBS] when they're not actually coming from [HBS]." (App. at 14.) The Court determined instead that the Domain Names "www.thewarmingstore.com" and "www.healthandbodystore.com" were unlikely to cause confusion as to the source of the goods sold on those Websites.

HBS and Hotheadz filed a timely notice of appeal.

## II.    Jurisdiction and Standard of Review

The District Court exercised jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1367.  We have jurisdiction under 28 U.S.C. § 1292(a).

"We review the denial of a preliminary injunction for 'an abuse of discretion, an error of law, or a clear mistake in the consideration of proof.'" *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (quoting *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994)).  "[A]ny determination that is a prerequisite to the issuance of an injunction … is reviewed according to the standard applicable to that particular determination."[7]  *Winback*, 42 F.3d at 1427 (internal quotation marks omitted).  "Thus, we exercise plenary review over the district court's conclusions of law and its application of law to the facts, but review its findings of fact for clear error, which occurs when we are left with a definite and firm conviction that a mistake has been committed."  *Duraco Prods., Inc. v. Joy Plastic Enters., Ltd.*, 40 F.3d 1431, 1438 (3d Cir. 1994) (citations and internal quotation marks omitted).  Our deferential review

---

[7] The familiar test for whether to grant a motion for a preliminary injunction, requires a district court to ask:

> (a) did the movant make a strong showing that it is likely to prevail on the merits?  (b) did the movant show that, without such relief, it would be irreparably injured?  (c) would the grant or denial of a preliminary injunction substantially have harmed other parties interested in, or affected by, the proceedings?  (d) where lies the public interest?

*Klitzman, Klitzman and Gallagher v. Krut*, 744 F.2d 955, 958-59 (3d Cir. 1984) (citation omitted).

is appropriate because a court nearly always bases the grant or denial of [a preliminary] injunction on an abbreviated set of facts, requiring a delicate balancing of the probabilities of ultimate success at [the] final hearing with the consequences of immediate irreparable injury that possibly could flow from the denial of preliminary relief.

*Krut*, 744 F.2d at 958.

## III.    Discussion

Hotheadz and HBS assert that the District Court abused its discretion by holding that they are unlikely to succeed on the merits of their breach of fiduciary duty claim. To determine whether the District Court's holding regarding that claim was an abuse of its discretion, we must first decide whether the Court could justifiably have concluded that the parties had no relationship giving rise to fiduciary obligations. Hotheadz and HBS contend that there is no justification for the District Court's ruling because Hotheadz and Justbrand "are both co-members of … HBS" – a relationship that necessarily "[gives] rise to … fiduciary and other obligations … ." (Appellants' Opening Br. at 40.) Silverman, Singer, and Justbrand respond that, even if HBS was duly formed, they never agreed to transfer ownership of the Websites to HBS and, therefore, Justbrand could not have breached any fiduciary duty to Hotheadz or HBS. That response is beside the point, and Hotheadz and HBS have the far more persuasive position.

Under Pennsylvania's Limited Liability Company Law of 1994 (the "LLC Act"), "[o]ne or more persons may organize a limited liability company," Pa. Cons. Stat.

12

§ 8912, by filing a certificate of organization,[8] id. at § 8913. Here, the parties did just that. The evidence of record demonstrates that Hotheadz and Justbrand duly formed HBS as a Pennsylvania LLC by filing a certificate of organization (the "Certificate") with the Commonwealth of Pennsylvania on January 14, 2010.[9] The Certificate contains (1) the name of the LLC (HBS); (2) HBS's initial registered office; (3) the name and address of HBS's organizer; (4) a statement that "[a] member's interest in [HBS] is to be evidenced by a certificate of membership interest"[10]; and (5) the hour, month, day and year of the effective date of HBS. (App. at 246.) The evidence also reveals that Justbrand and Hotheadz are the only members of HBS,[11] and that Silverman and Singer are the only members of Justbrand. As noted above, Silverman testified that he and Singer formed Justbrand to hold their interest in HBS, and state and federal tax documents filed by the parties demonstrate that Justbrand is a member of HBS. It seems plain, then, that

[8] The certificate must contain: (1) the name of the LLC; (2) "the address, including street and number, if any, of [the company's] initial registered office"; (3) "[t]he name and address, including street and number, if any, of each of the organizers"; (4) a statement of a member's interest in the company if that interest is "evidenced by a certificate of membership interest"; (5) a statement that "management of the company is vested in a manager or managers," if the company chooses to vest management in managers; (6) the hour, month, day, and year of the effective date of the company; (7) a statement that the company is a restricted professional company, if applicable; and (8) any other provision the members of the LLC choose to include in the certificate of organization. 15 Pa. Cons. Stat. § 8913.

[9] Hotheadz and HBS pointed this out to the District Court. (*See* App. at 521 ("[I]n January of 2010 there was a reconfiguration of the relationship [between Hotheadz and Appellees] … and that's when Health and Body Store, LLC was formed."); *id.* at 525 ("[A]ll the indicia of a commonly owned partnership relationship existed, first in the form of a partnership, secondarily, in the form of an LLC.").)

[10] We note that the parties did not include the "certificate of membership interest" in the appellate record.

[11] *See supra* notes 4 and 5.

13

Silverman and Singer, acting through Justbrand, cooperated with Hotheadz in the formation of HBS, a valid Pennsylvania LLC, and that Hotheadz and Justbrand are the members of that LLC.

By operation of law, because it is a member of HBS, Justbrand owes fiduciary duties to its fellow member, Hotheadz. Under Pennsylvania's LLC Act, "[i]f [an LLC's] certificate of organization does not contain a statement to the effect that [a] limited liability company shall be managed by managers," then the provisions of partnership law govern the relations between the members of the LLC. *See* 15 Pa. C.S. § 8904 ("If the certificate of organization does not contain a statement to the effect that the limited liability company shall be managed by managers, the provisions of Chapters 81 (relating to general provisions) and 83 (relating to general partnerships) govern, and the members shall be deemed to be general partners for purposes of applying the provisions of those chapters."). Because HBS's certificate of organization does not state that it "shall be managed by managers," *id.*, Pennsylvania partnership law governs the relationship between Justbrand and Hotheadz, and "[t]here is a fiduciary relationship between partners," *Clement v. Clement*, 260 A.2d 728, 729 (Pa. 1970). The rationale for that rule is that "[o]ne should not have to deal with his partner as though he were the opposite party in an arms-length transaction," and "should be allowed to trust his partner, to expect that he is pursuing a common goal and not working at cross-purposes." *Id.* Among the fiduciary duties that partners owe each other are the duty of loyalty, *id.*, and the corresponding obligation to act for the benefit of the other members of the partnership, *see Hamberg v. Barsky*, 355 Pa. 462, 465 (1947) (stating that a "confidential relation …

14

is one wherein a party is bound to act for the benefit of another, and can take no advantage to himself" (internal quotation marks omitted)); *Poeta v. Jaffe*, 51 Pa. D. & C.4th 78, 84 (Pa. Ct. Com. Pl. 2001) ("In general, partners owe a fiduciary duty to each other to act in good faith during the life of the partnership."); *cf.* 15 Pa. Cons. Stat. § 8334 (noting that partners have a duty to account).

Justbrand also owed fiduciary duties to HBS. Under Pennsylvania law, a partner is accountable as a fiduciary to the partnership, which is here embodied in the LLC. *See* 15 Pa. Cons. Stat. § 8334 ("Every partner must account to the partnership for any benefit and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct or liquidation of the partnership or from any use by him of its property."). Thus, "[w]here one partner has so dealt with the partnership as to raise the probability of wrongdoing" it is his "responsibility to negate that inference." *Clement*, 260 A.2d at 729.

Here, the District Court abused its discretion by failing to recognize that Justbrand owed fiduciary duties to Hotheadz and HBS, and by neglecting to examine whether Justbrand breached those duties through the conduct of Silverman and Singer.[12]

---

[12] Under Pennsylvania law, "[e]very partner is an agent of the partnership for the purpose of its business and the act of every partner … for apparently carrying on in the usual way the business of the partnership … binds the partnership … ." 15 Pa. Cons. Stat. § 8321. Here, the record reveals that Silverman and Singer were the only members of Justbrand and acted as agents of Justbrand. Thus, as agents of Justbrand (*see* App. at 177 (demonstrating that Silverman and Singer used website www.healthandbodystore.com to further the business operations of Justbrand)), they were obligated to operate the Websites in a manner consistent with Justbrand's fiduciary obligations to Hotheadz and to HBS.

Specifically, the District Court did not consider whether Justbrand knowingly and intentionally deprived HBS of access to, and use of, the Websites and associated bank accounts, which were the sole means by which HBS marketed products and generated and collected revenue. Nor did the Court appropriately consider whether Justbrand or its agents breached fiduciary duties by using the Websites to market and sell the same products HBS sold through the same Websites without putting consumers on notice that HBS was not actually selling those products,[13] and thus expropriating the goodwill associated with the Websites.

Given the procedural posture of this case, we will not decide in the first instance whether the actions of Singer, Silverman, and Justbrand constitute breaches of Justbrand's fiduciary obligations to Hotheadz and HBS.[14] *See Forestal Guarani S.A. v.*

---

[13] Donato's affidavit states that "the Websites which the Defendants took from HBS are absolutely identical to the Websites owned, operated and developed for nearly … three years by HBS. There have been no material changes to them … ." (App. 59.)

[14] Whether Singer and Silverman independently owed duties to Hotheadz and HBS is a matter we also leave to the District Court to determine upon remand. It is worth noting, for example, that there is evidence that Silverman was acting as an agent of HBS. At times, Silverman represented that he was a "partner," "owner," "president," and "vice-president," of HBS and he executed various agreements as a manager of HBS. To the extent that Silverman actually held any of those positions with HBS, he was evidently an agent of HBS and had fiduciary obligations to that company. *See Garbish v. Malvern Fed. Sav. & Loan Ass'n*, 517 A.2d 547, 553-54 (Pa. Super. Ct. 1986) ("Under Pennsylvania law, the duty of an agent to his principal is one of loyalty in all matters affecting the subject of his agency, and the agent must act with the utmost good faith in the furtherance and advancement of the interests of his principal.") (citation and internal quotation marks omitted); *id.* at 554 ("Because the relationship between the parties … was an agency relationship, appellant owed appellees a fiduciary duty and its conduct must be measured against the standard of care owed by a fiduciary.").
Whether duties were owed independently or through Justbrand, even Singer, Silverman, and Justbrand seemed to acknowledge at oral argument that it would be

*Daros Int'l., Inc.*, 613 F.3d 395, 401 (3d Cir. 2010) ("We ordinarily decline to consider issues not decided by a district court, choosing instead to allow that court to consider them in the first instance."). It is enough to say that the District Court abused its discretion by failing to recognize that fiduciary duties were owed and by failing to consider whether those duties were breached.[15]

---

fundamentally unfair for Silverman and Singer, acting as agents of Justbrand, to undermine the interests of Hotheadz and HBS, to the extent that Justbrand owed those entities fiduciary duties. Indeed, when asked during oral argument "if Justbrand were found to be in violation of its fiduciary duties to Health and Body Store LLC because of the actions of the only human beings associated with it …, would the response … by your clients be 'well that's Justbrand; we don't have anything to do with that,'" counsel for Singer, Silverman, and Justbrand responded, "no, I don't think that would be fair your honor; I don't think that would be fair." (Oral Argument at 18:23, Health and Body Store, LLC and Hotheadz Int'l, Inc. v. Justbrand Limited et al. (No. 11-4132), available at http://www.ca3.uscourts.gov/oralargument/audio/11-4132HealthandBodyStorev.JustbrandLtd.wma.)

[15] Appellants also challenge the District Court's decision regarding their Lanham Act unfair competition and false designation of origin claims. In order to succeed on a false designation of origin or unfair competition claim under the Lanham Act, a plaintiff must prove that: "(1) the mark [it seeks to protect] is valid and legally protectable, (2) [the plaintiff] owns the mark, and (3) the defendant's use of the mark is likely to create confusion concerning the origin of goods or services" associated with the mark. *E.T. Browne Drug Co. v. Cococare Prods., Inc.*, 538 F.3d 185, 191 (3d Cir. 2008) (citation omitted) (elements of trademark infringement claim); *see A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000) ("We measure federal trademark infringement, 15 U.S.C. § 1114, and federal unfair competition, 15 U.S.C. § 1125(a)(1)(A), by identical standards."). At this juncture in the litigation, we lack a sufficient evidentiary basis for determining whether the District Court abused its discretion by denying Appellants' motion for a preliminary injunction as to their Lanham Act claims because it is unclear who has a valid and legally protectable interest in the identity and appearance of the Websites. We note that there appears to be considerable overlap between the Lanham Act claims and the breach of fiduciary duty claim. Those claims center on the allegation that Singer, Silverman, and Justbrand engaged in wrongful behavior by using identical Websites both before and after they discontinued their relationships with Hotheadz and HBS, and that, in doing so, they stole all of the business

17

## IV.    Conclusion

We will thus vacate the District Court's order denying Appellants' motion for a

preliminary injunction and remand the matter for further proceedings.[16]

---

and customer goodwill associated with the Websites.  We leave it to the District Court to decide in the first instance how the claims may be interrelated.

[16] We say nothing about the remedy that may be appropriate in the event that the District Court determines that HBS and Hotheadz are entitled to some form of preliminary relief for breach of fiduciary duties.  It is possible, of course, that no remedy at all should be given, even if there has been a breach, since the balance of equities may make a preliminary injunction inadvisable.  *Cf. Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) (in deciding whether to award injunctive relief, "the court balances the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction." (internal quotation marks and citation omitted)).  And, if some relief is warranted, that does not necessarily mean that the relief HBS and Hotheadz seek is equitable or even feasible.  Whether control of the Websites can or should be returned to HBS or whether some other relief is in order is a matter committed to the sound discretion of the District Court.